FILED
2021 SEP 1
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| FRANCELL SEEGMILLER,<br><br>               Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI, Acting Commissioner of Social Security,<br><br>               Defendant. | MEMORANDUM DECISION AND ORDER<br><br><br><br>Case #4:20-cv-00124 PK<br><br>Magistrate Judge Paul Kohler |

Francell Seegmiller appeals the decision of the Social Security Administration denying her application for disability and disability insurance benefits. The Court held oral arguments on August 31, 2021. Having considered the arguments, the record, and the law, the Court will reverse and remand the decision.

I. BACKGROUND

A. PROCEDURAL HISTORY

On September 29, 2017, Plaintiff filed an application for disability and disability insurance benefits alleging disability beginning August 1, 2014. The alleged date of onset was later amended to July 3, 2015. The claim was denied initially and upon reconsideration. Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which was held on November 8, 2019. The ALJ issued a partially favorable decision on December 27, 2019. The decision found Plaintiff disabled as of August 15, 2018—her fifty-fifth birthday—but not before. The decision became the Commissioner's final decision when the Appeals Council denied review on September 24, 2020.

B.  MEDICAL HISTORY

Plaintiff suffered from ADHD, depression, and anxiety at least as early as 2014. In July 2015, she developed meningitis and suffered a stroke that required life support. Despite a good recovery, the records show that Plaintiff was left with long-term problems including balance, fatigue, pain, headaches, hearing, and memory, as well as worsened depression. In July 2016, Plaintiff suffered a seizure and was placed on Lamictal, which was discontinued after a year of seizure freedom. She had surgery in early 2019 to evaluate and treat a spinal fluid leak. Plaintiff also had long-standing blood pressure problems.

C.  MEDICAL OPINION EVIDENCE

1. Dr. Randall T. Hansen[1]

Treating physician Dr. Randall T. Hansen opined in November 2017 that Plaintiff could lift between twenty and thirty pounds, stand or walk for two hours a day, and sit for between two and four hours a day. He indicated that Plaintiff's symptoms would interfere with the attention and concentration needed to perform simple, routine tasks at least 20% of the workday. He indicated she would be off task at least 20% of the time, miss work one to two days per month due to her impairments or need for medical treatment, and have only 60% efficiency compared to an average worker. He stated that working full time would be "very difficult" for Plaintiff. Dr. Hansen believed that Plaintiff's limitations had existed since at least August 2014.

Dr. Hansen filled out another disability form in September 2019 in which he again indicated that Plaintiff's limitations had probably existed since at least August 2014. He found her capable of lifting up to ten pounds and standing/walking less than two hours. Again he opined that

---

[1] R. 516–17, 1322–23.

2

she would have interference from her symptoms 20% or more of the time, be off task 20% or more of the time, be absent one or two days per month, and operate at only 60% of average efficiency. He repeated that full-time work would be "extremely difficult" for Plaintiff.

 2. Dr. Trenton Overall[2]

Treating neurologist Dr. Overall opined in December 2017 that Plaintiff could stand and/or walk for thirty minutes to one hour in a workday, occasionally lift or carry twenty pounds, and frequently carry ten pounds. He also explained that Plaintiff had some neurological deficits as a result of her stroke, including fatigue, pain, frequent headaches, cognitive impairment, and weakness in her left arm and leg. He opined that these seriously limited her ability to initiate, sustain, and complete work-related physical activities. Dr. Overall further stated that Plaintiff had serious limitations in understanding, remembering, or applying information, and in adapting to changes and making independent plans. He also opined that she had limitations in sustaining an ordinary routine, regular attendance at work, and working a full day with only the allotted rest periods. Dr. Overall explained that Plaintiff's limitations had lasted since at least August 2014.

 3. Dr. Kent Gardner[3]

Treating physician Dr. Kent Gardner stated on October 1, 2019, that Plaintiff's impairments, symptoms, and limitations had lasted since at least August 2014. He opined that Plaintiff could lift between ten and twenty pounds and could stand/walk less than two hours due to fatigue and foot discomfort. Dr. Gardner believed Plaintiff's symptoms would interfere with her attention and concentration for simple, routine tasks 20% or more of the time, she would be off

---

[2] *Id.* at 617–25.
[3] *Id.* at 1329–30.

3

task 20% or more of the time, she would miss one day of work a month on average, and she would work at less than 50% of average efficiency.

    4. Dr. Christopher D. Anderson[4]

Consultative psychological examiner Dr. Christopher D. Anderson evaluated Plaintiff on June 19, 2018. Dr. Anderson described Plaintiff's mood as low and her affect at times tearful. She scored within normal limits on a mental status examination, although she had some difficulty with memory. On the Weschler Memory Scale-IV, she scored borderline, extremely low, low average, or average on all subtests. Dr. Anderson indicated that these scores signified problems with recalling information presented orally or visually; recall and use of certain types of visual information; and recalling information after short and long delays. Dr. Anderson stated that these could affect Plaintiff's capacity to remember important facts when processing the requirements of a job, following instructions, recalling what she has learned, and retrieving various types of information. Regarding her mood, Dr. Anderson noted that she "appeared to be experiencing a depressed mood. Her affect was dysphoric. The claimant was frequently tearful as she discussed her current and past situations. Her body posture, facial expressions, and demeanor reflected depressive symptoms. Her energy level appeared to be low. She also displayed an undercurrent of anxiety." He indicated that Plaintiff presented with major depressive disorder with anxious distress, ADHD, and a mild neurocognitive disorder related to memory. He described Plaintiff's reports of worsening depression and anxiety since her coma in 2015, her history of ADHD, and her history of forgetfulness since her coma.

---

[4] *Id.* at 654–61.

5. Dr. Charisma O. Pinna[5]

Consultative neurology examiner Dr. Charisma O. Pinna examined Plaintiff on June 20, 2018. Dr. Pinna assessed mostly normal physical function except that Plaintiff was hesitant to extend her neck and back all the way or bend and twist to the left side for fear of dizziness and losing her balance; tandem walking was a bit unsteady; and she could not hop on one leg. Dr. Pinna made no findings about Plaintiff's functional abilities in a work context.

6. Dr. Lisa Venkataraman[6]

Agency medical consultant Dr. Lisa Venkataraman completed a Physical Residual Functional Capacity Assessment on December 18, 2018. She opined that Plaintiff could occasionally lift or carry twenty pounds, stand and/or walk for a total of six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. She assessed limitations in climbing and balancing, hearing, and exposure to noise and hazards.

7. State Agency Reviewing Physicians[7]

In January 2018, Dr. Lewis J. Barton evaluated Plaintiff's medical record and concluded that she could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk six hours in an eight-hour workday, and sit about six hours in a normal workday, with some postural and environmental limitations. Dr. Barton thus found her capable of "light tasks." Alison Musso, Ph.D. assessed Plaintiff's mental impairments as mild. The disability examiner found Plaintiff not disabled.

---

[5] *Id.* at 663–66.
[6] *Id.* at 680–87.
[7] *Id.* at 81–93, 97–116.

On reconsideration in July 2018, Dr. Kim Heaton agreed with Dr. Barton's assessment of light work with postural and environmental limitations. Joan Zone, Ph.D. opined that Plaintiff had limitations in understanding and memory including moderate limitations in carrying out short and simple instructions, marked limitations in carrying out detailed instructions, and moderate limitations in maintaining attention and concentration for extended periods. Dr. Zone also assessed moderate limitations in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Zone also indicated moderate limitations in adaptation. Dr. Zone opined that Plaintiff could carry out repetitive tasks requiring thirty days or less of training. Because Plaintiff was nearing advanced age, she was found disabled as of the day of adjudication: July 12, 2018.

D.  HEARING TESTIMONY[8]

At the hearing in November 2019, Plaintiff testified that she stopped working in 2014 due to a nervous breakdown prompted by a hostile work environment. Plaintiff testified that since her stroke she had suffered headaches and fatigue due to a spinal fluid leak. She also testified that she had memory issues since the stroke. For example, she testified that she had to write on a calendar when to brush her teeth and shower, she would forget important events, and she could not recall the details of conversations. She testified that she drove only occasionally and only short distances. She testified that she could not stand or walk for long periods because of pain and fatigue. She also explained that she had balance and dizziness issues that prevented her from bending over and made her fearful when walking. She explained that she had horses which she used for therapy but she no

---

[8] *Id.* at 37–80.

longer rode them after falling off in November 2017. She testified that she still cared for the horses but rode a golf cart for the ten-second ride down to the horses.

The ALJ presented the vocational expert ("VE") with a hypothetical of an individual of Plaintiff's age, education, and experience who was capable of light work with some postural and environmental limitations as well as a limitation to simple tasks typical of unskilled occupations with no production rate pace work. The VE described several jobs in the national economy that such an individual could perform. The ALJ asked the VE about changing the exertional level to sedentary and the VE described several jobs such an individual could perform. After several more hypotheticals, Plaintiff's attorney asked the VE if any of the jobs identified for the first hypothetical would be available if the individual were limited to standing and/or walking two hours a day and the VE testified that they would not. The attorney also inquired about whether the jobs would be available if the individual were off task 20% of the workday and the VE testified that they would not. The VE also testified that a 50% rate of productivity would be work preclusive.

E. THE ALJ'S DECISION[9]

At step one of the five-step sequential evaluation process, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the amended alleged onset date. At step two, the ALJ found that Plaintiff had the severe impairments of stroke, seizure disorder, vertigo, partial left-sided hearing loss, affective/mood disorder, and anxiety-related disorders. At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. The ALJ determined that between the amended onset date and August 15, 2018, Plaintiff had the residual functional capacity to perform light work with certain

---

[9] *Id.* at 13–25.

modifications including a limitation to "simple tasks typical of unskilled occupations." At step four, the ALJ determined that Plaintiff could not perform any past relevant work. At step five, the ALJ found that there were other jobs that exist in significant numbers in the national economy that Plaintiff could perform and that, therefore, she was not disabled before August 15, 2018. The ALJ found Plaintiff disabled as of August 15, 2018—her fifty-fifth birthday, at which point she was considered of "advanced age" under the regulations.[10]

### III. STANDARD OF REVIEW

This Court's review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence and whether the correct legal standards were applied.[11] "Substantial evidence 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[12] If supported by substantial evidence, the Commissioner's findings are conclusive and must be affirmed.[13] The Court should evaluate the record as a whole, including the evidence before the ALJ that detracts from the weight of the ALJ's decision.[14] However, the reviewing court should not re-weigh the evidence or substitute its judgment for that of the Commissioner.[15]

---

[10] "[A]dvanced age (age 55 or older) significantly affects a person's ability to adjust to other work." 20 C.F.R. § 404.1563(e). "Accordingly, if a claimant is of advanced age and is limited to only light or sedentary work, the claimant will be considered unable to make the adjustment to other work at step five of the sequential analysis unless the claimant has acquired skills in her past work that she can transfer to other skilled or semiskilled jobs that she can perform despite her limitations." *Webster v. Barnhart*, 187 F. App'x 857, 859 (10th Cir. 2006) (citing 20 C.F.R. § 404.1568(d)(4)).

[11] *Rutledge v. Apfel*, 230 F.3d 1172, 1174 (10th Cir. 2000).

[12] *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

[13] *Richardson*, 402 U.S. at 390.

[14] *Shepherd v. Apfel*, 184 F.3d 1196, 1199 (10th Cir. 1999).

[15] *Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th Cir. 2000).

IV. DISCUSSION

Plaintiff argues that the ALJ failed to adequately explain inconsistencies between the medical opinion evidence and the RFC. The Court agrees.

For applications filed on or after March 27, 2017, an ALJ is not required to defer to or give any specific weight to medical opinions or prior administrative medical findings.[16] Rather, the ALJ considers them using the criteria in 20 C.F.R. § 404.1520c(c): (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors tending to support or contradict a medical opinion or prior administrative medical finding. The most important criteria for determining persuasiveness are the supportability and consistency.[17] "For supportability, the strength of a medical opinion increases as the relevance of the objective medical evidence and explanations presented by the medical source increase."[18] "Consistency, on the other hand, is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record."[19]

The ALJ must articulate "how persuasive [he or she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record."[20] The ALJ must explain how he or she considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings, but is generally not required to explain how he

---

[16] 20 C.F.R. § 404.1520c(a).

[17] *Id.* § 404.1520c(a), (b)(2).

[18] *John H. v. Saul*, No. 2:20-CV-00255-JCB, 2021 WL 872320, at *4 (D. Utah Mar. 8, 2021) (internal quotation marks and citation omitted).

[19] *Id.*

[20] 20 C.F.R. § 404.1520c(b).

9

or she considered other factors.[21] Social Security Ruling 96-8p emphasizes that "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence."[22]

Here, the most relevant portions of the ALJ's decision are as follows:

In regard to medical opinions, the undersigned assigns great weight to the state physicians' in Exhibit 1A; 4A, finding the claimant capable of light exertional work with some postural and environmental limitations. These findings were supported by the evidence as a whole. The claimant's evidence indicates seizure precautions as discussed in detail above. However, Trenton Overall's opinion in Exhibit 6F is consistent with light exertional work, but no further limitations are supported prior to the established onset date.

June 2018, just prior to the established onset date, Chris Anderson, Ph.D., opined that claimant's attention and concentration appeared normal; she had borderline low and extremely low range memory findings but mild neurocognitive disorder with only moderate depression. There are minimum mental health treatment records prior to the established onset date. There are no records indicating significant issues.
. . .
The undersigned finds that Charisma Pinna, M.D.,['s] opinion was persuasive and consistent with the record as a whole. The consultative examiner did not provide a specific residual functional capacity analysis, however, the undersigned finds her narrative report is consistent with the findings reached herein. The claimant was hesitant to extend her neck and back all the way or bend and twist to the left side for fear of dizziness and losing her balance (Exhibit 11F/4). Her tandem walking was a bit unsteady and she was unable to hop on one leg (Id.). Thus, Lisa Venkataraman, M.D., Exhibit 13F, Tyler Hansen, DO., Exhibit 18F, and Kent Gardner, M.D., Exhibit 21F are also afforded great weight because they found claimant to be off tasks [sic] or at least absent 1-2 days due to symptoms related to her impairments. Therefore, all other opinions such as Randell Hansen, DO., who found she could perform medium exertional work and [sic] is assigned little weight

---

[21] *Id*. § 404.1520c(b)(2).

[22] *Id.*; *see also Givens v. Astrue*, 251 F. App'x 561, 568 (10th Cir. 2007) ("If the ALJ rejects any significantly probative medical evidence concerning [a claimant's] RFC, he must provide adequate reasons for his decision to reject that evidence.").

because of it is unpersuasive and inconsistency [sic] with the records as a whole (Exhibit 4F).[23]

The ALJ's reasoning is sometimes difficult to follow and, more importantly, it misstates or distorts the medical opinion evidence.

The ALJ, for example, states that Dr. Overall's opinion was consistent with light exertional work, but Dr. Overall's opinion was *not* consistent with light exertional work. Light work requires, among other things, the ability to stand and/or walk for six hours of an eight-hour workday.[24] Dr. Overall opined that Plaintiff could stand and/or walk for only thirty minutes to one hour in an eight-hour workday. The ALJ appears not to have recognized that Dr. Overall's opinion about exertional levels was more restrictive than the state agency reviewing physicians. Accordingly, he failed to explain why he credited the state agency physicians' exertional limitations over Dr. Overall's more restrictive assessment, and he failed to explain how he could rely on Dr. Overall's assessment for his conclusion. His final statement that "no further limitations are supported prior to the established onset date" is so vague in context it leaves this Court unable to meaningfully review it.

The ALJ's treatment of the opinion of Dr. Anderson is equally problematic. The ALJ suggested there were "minimum" mental health records prior to the established onset date and "no records indicating significant issues." While Plaintiff's records do not show care by any mental health professional, the characterization of the evidence as indicating no significant issues is not supported by substantial evidence. Records from Plaintiff's primary care provider, however,

---

[23] R. 21–22.

[24] *Gutierrez v. Barnhart*, 109 F. App'x 321, 326–27 (10th Cir. 2004) (citing 20 C.F.R. §§ 404.1567(b), 416.967(b); SSR 83-10, 1983 WL 31251 (Jan. 1, 1983)).

indicate that in 2014, Plaintiff stopped working and went on short-term disability because of work-related anxiety. On August 1, 2014, Plaintiff presented at her physician's office stating that she felt she was nearing a breakdown.[25] The physician noted "very depressed, anxious, crying mood and behavior," prescribed Lexapro and Wellbutrin, and advised Plaintiff to get therapy.[26] He filled out short-term disability paperwork for her and told her to come in every two weeks for the next two months to follow up on the depression.[27] On September 19, 2014, Plaintiff's physician reported that she continued to be off work due to anxiety; he described her as tearful and emotional, and her affect as "constricted/intense."[28] He noted that she was taking the prescribed medications but did not feel improvement.[29] The physician diagnosed anxiety and depression and referred her for counseling.[30] On a mental health report of September 22, 2014, Plaintiff reported that she had symptoms of depression nearly every day and that they made it "very difficult" to work, take care of things at home, and get along with other people.[31] On November 10 and 25, 2014, Plaintiff's physician again noted that she was not working due to anxiety.[32] On November 25, 2014, the physician again observed that her affect was "constricted/intense."[33] On December 5, 2014, Plaintiff reported anxiety and lack of motivation; the physician noted psychomotor agitation and

---

[25] R. 603.
[26] *Id.* at 604.
[27] *Id.*
[28] *Id.* at 599–600.
[29] *Id.*
[30] *Id.* at 600.
[31] *Id.* at 597.
[32] *Id.* at 592, 589.
[33] *Id.* at 589.

prescribed Cymbalta.[34] Plaintiff's existing depression appears to have worsened after her stroke. On February 2, 2016, she reported symptoms of depression and expressed that her mood medication did not seem to be as effective as before, and her physician increased her dosage.[35] Two notes in 2017 show that Plaintiff reported severe and worsening depression.[36] In his consultative exam of June 2018, Dr. Anderson reported that Plaintiff "appeared to be experiencing a depressed mood. Her affect was dysphoric. The claimant was frequently tearful as she discussed her current and past situations. Her body posture, facial expressions, and demeanor reflected depressive symptoms. Her energy level appeared to be low. She also displayed an undercurrent of anxiety."[37] In light of this evidence, the ALJ's statement that there were no records of significant mental health issues is not supported by the evidence.

The ALJ's treatment of the 2019 opinions of Drs. Venkataraman, Hansen, and Gardner is also difficult to make sense of. The ALJ states that these opinions are "afforded great weight because they found claimant to be off tasks [sic] or at least absent 1-2 days due to symptoms related to her impairments." First, Dr. Venkataraman made no such finding in her opinion. Second, if the ALJ had actually afforded these opinions "great weight" (which is not anticipated under the new regulations) then the RFC should have included a limitation for off-task behavior or absenteeism--or at least explained why it did not.

As for the ALJ's treatment of Dr. Hansen's 2017 opinion, the ALJ states that Dr. Hansen found that Plaintiff could perform medium exertional work, but Dr. Hansen did not do so. Dr.

---

[34] *Id.* at 586.
[35] *Id.* at 541–43.
[36] *Id.* at 525, 646.
[37] *Id.* at 659.

13

Hansen opined that Plaintiff could stand/walk only two hours and sit only two to four hours; as already explained, this is not even enough for light work. And because the ALJ apparently misread this opinion, he naturally did not explain why he was not adopting the more restrictive RFC that would have corresponded to it. Additionally, his statement that Dr. Hansen's opinion is "assigned little weight because of it is unpersuasive and inconsistency with the records as a whole" is unhelpful because it refers to an opinion Dr. Hansen did not give.

The ALJ's analysis of the medical opinions falls short of satisfying the regulations' requirement to articulate and explain the persuasiveness of each medical opinion, and leaves the Court without confidence in the ALJ's analysis.

The Court finds the ALJ's failure to give reasoned explanations for his treatment of more restrictive medical opinions not harmless. To take one example, several providers opined that Plaintiff would be off task a significant amount of the time. There is evidence in the record to support an off-task limitation, including treatment notes indicating that Plaintiff had chronic pain making it difficult for her to function fully. The VE testified that a 20% off-task rate would preclude all the jobs identified for a person with Plaintiff's other limitations. Thus, the ALJ's adoption of the physicians' off-task limitations could conceivably have changed the outcome.

The Commissioner argues that the ALJ's evaluation of the medical opinion evidence is apparent from the RFC itself--i.e., the Court can infer that the ALJ did not find further restrictions persuasive because further restrictions did not end up in the RFC. This in an inference the Court does not believe it can make. Doing so would overlook the requirement set out in the regulations

that the ALJ articulate the persuasiveness of each medical opinion. It would also, in the Court's view, constitute an improper post-hoc rationalization.[38]

The Commissioner also argues that Plaintiff is inviting the Court to improperly reweigh the medical evidence. The Court, however, makes no finding about the ultimate persuasiveness of any medical opinion evidence. Rather, the Court finds that the ALJ failed to adequately articulate his findings and produce an evaluation of the medical opinion evidence that a reasonable mind would accept as adequate to support his conclusions.

Because the ALJ failed to adequately articulate the persuasiveness of the medical opinion evidence and how that evidence supported the RFC, and because the error was not harmless, the decision will be reversed and remanded to the agency for further consideration.[39]

---

[38] *See Stacey L. C. v. Saul*, No. CV 20-1064-JWL, 2021 WL 147254, at *4 (D. Kan. Jan. 15, 2021) (refusing to apply a harmless error analysis to ALJ's failure to articulate rationale for treatment of medical opinion evidence) (citing *Allen v. Barnhart*, 357 F.3d 1140, 1144–45 (10th Cir. 2004)); *see also SEC v. Chenery Corp.*, 318 U.S. 80 (1943).

[39] *Cf. Amber H. v. Saul*, No. 3:20-CV-490 (ATB), 2021 WL 2076219, at *5–9 (N.D.N.Y. May 24, 2021) (remanding where ALJ's discussion of medical opinion evidence was "limited" and "replete with misrepresentations"); *Brooker v. Saul*, No. CIV-20-398-P, 2021 WL 1392860, at *6 (W.D. Okla. Apr. 13, 2021) (remanding where, among other errors, the ALJ inaccurately characterized the medical opinion evidence).

## IV. CONCLUSION

It is therefore ORDERED that the ALJ's decision is REVERSED AND REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for the purposes of conducting additional proceedings as set forth herein.

DATED this 1st day of September 2021.

BY THE COURT:

PAUL KOHLER
United States Magistrate Judge